## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9123 | **DATE** | 7/19/2004 |
| **CASE TITLE** | Larry T. Chmiel vs. Opto Technology, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' Motion for Summary Judgment (Docket No. 10-1) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 20 2004 | 18 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/19/2004 | |
| | | | date mailed notice | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 2004 JUL 19 AM 11:12 date/time received in central Clerk's Office | ETV mailing deputy initials | |

LARRY T. CHMIEL,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        No. 02 C 9123
                                    )
OPTO TECHNOLOGY, INC., and          )        Judge Rebecca R. Pallmeyer
TOM HEGBERG, Individually,          )
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

Plaintiff Larry Chmiel filed suit against Opto Technology, Inc. ("Opto") and its president, Tom Hegberg, alleging that they terminated his employment in order to remove him from the company's health insurance plan in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. In addition, Chmiel claims that Opto discriminated against him on the basis of his age and a perceived disability in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Defendants now seek summary judgment on all of Chmiel's claims. For the reasons explained here, the motion is granted.

## BACKGROUND

Opto manufactures and distributes optoelectronics products, which are "light emitting and light detecting sensors." (Def. 56.1 ¶ 7.)[1] Chmiel, an Illinois Registered Professional Engineer with approximately 20 years experience in quality control assurance, was hired to work as Opto's Quality Assurance Manager ("Quality Manager") on February 21, 2000, at the age of 57.[2] (*Id.* ¶¶ 8, 10, 11-13.) Opto's Director of Operations, John DiNardi (age 35 as of July 15, 2003),

_____

[1]      The Rule 56.1 Statement of Opto Technology, Inc. and Tom Hegberg is cited as "Def. 56.1 ¶ __."

[2]      Chmiel was born on February 7, 1943. (Chmiel Dep., at 11.)

recommended that Hegberg (age 36),[3] then serving as Opto's Vice President and General Manager, hire a Quality Manager because he believed that Opto needed someone to oversee the quality department. (DiNardi Dep., at 14, 38; Pl. 56.1 ¶ 95; Hegberg Dep., at 7.)[4] DiNardi and Hegberg both interviewed Chmiel for the position and Hegberg approved DiNardi's recommendation to hire him at a bi-weekly salary of $2,692.30 (approximately $70,000 per year). (Def. 56.1 ¶¶ 15, 16, 21.)

As Opto's Quality Assurance Manager, Chmiel supervised two or three quality inspectors and, initially, reported to DiNardi. (Id. ¶¶ 14, 19, 21.) After DiNardi resigned in May 2000, Chmiel began reporting directly to Hegberg. (Id. ¶¶ 19, 20.) When Hegberg became President of Opto in mid-2001, he began supervising Director of Engineering James Swayne, Director of Operations Ron Kiss, and an unidentified Sales Manager in addition to Chmiel.[5] (Pl. 56.1 ¶¶ 92, 130; Def. 56.1 Resp. ¶ 92; Hegberg Dep., at 13.)[6] Hegberg conducted formal annual reviews of his employees and also tried to meet with them on an informal basis every 90 days or so to discuss their performance. (Def. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26; Hegberg Dep., at 54.)[7]

## A.    Chmiel's Performance Reviews

At the time he was hired, Chmiel understood that his job would involve both management functions and "hands-on" work resolving management and customer problems. (Def. 56.1 ¶ 18;

---

[3]    Hegberg was born on May 1, 1968. (Hegberg Dep., at 6.)

[4]    Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts is cited as "Pl. 56.1 ¶ __."

[5]    As of September 12, 2002, Swayne was 39 years old and Kiss was 31 years old. (Pl. 56.1 ¶¶ 133, 134; PX X.)

[6]    Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Material Facts is cited as "Def. 56.1 Resp. ¶ __."

[7]    Plaintiff's 56.1(b)(3)(A) Statement of Facts Controverting Defendants' 56.1(a)(3) Statement is cited as "Pl. 56.1 Resp. ¶ __."

Pl. 56.1 Resp. ¶ 18; Chmiel Dep., pp. 76-77.) Chmiel's management functions included preparing the processes and procedures for quality inspection of products; analyzing products returned by customers to determine the cause of any defects; and preparing failure analysis reports ("FARs") and corrective action reports describing the cause of any identified defects. (Pl. 56.1 ¶¶ 112, 106.) Throughout his employment, Chmiel prepared more than 100 inspection processes and procedures for Opto. His performance in preparing FARs and corrective action reports was very good. (Id. ¶ 109; Hegberg Dep., at 107.) Hegberg states, however, that at each of his quarterly meetings with Chmiel, he urged Chmiel to learn more about Opto's products and become more "hands-on." (Hegberg Aff. ¶ 5.) Chmiel denies this but admitted at his deposition that Hegberg did tell him to spend more time in the shop working with quality inspectors:

> Q:    Did Mr. Hegberg ever ask you to spend more time back in the shop rolling up your
>       sleeves, working with the quality inspectors?
>
> A:    He has made that comment.

(Chmiel Dep., at 129.)

Hegberg formally evaluated Chmiel's performance twice during Chmiel's tenure with Opto. Around the first anniversary of Chmiel's employment in February 2001, Hegberg indicated that he was generally satisfied with Chmiel's performance but urged him to become more familiar with Opto's product line and to spend more time out of his office on the production floor assisting the quality inspectors, engineers, and manufacturing employees. (Def. 56.1 ¶ 25; Hegberg Aff. ¶ 4.) Specifically, Hegberg indicated that Chmiel needed to "work more with the QC [quality control] staff to help them grow within the company + professionally." (PX S, Annual Staff Performance Evaluation of 2/20/01, at 3.) Citing DiNardi's deposition testimony, Chmiel insists that he was in fact spending half of his time on the production floor. (Pl. 56.1 Resp. ¶ 25; DiNardi Dep., p. 34.) DiNardi, however, was no longer working at Opto for the eight months leading up to Chmiel's

February 2001 review. (Def. 56.1 ¶ 19, Pl. 56.1 Resp. ¶ 19.) In any event, it is undisputed that Hegberg gave Chmiel a 7.5% salary increase at that time. (*Id.* ¶ 24; Pl. 56.1 ¶ 102.)

Hegberg evaluated Chmiel a second time in February or March 2002. On this occasion, Hegberg told Chmiel that he needed to "improve his technical understanding and ability with respect to Opto's products so that he could participate more in discussions with sales, marketing and engineering about designs." (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.) Hegberg told Chmiel he believed that Chmiel would earn more respect from the engineering staff if he knew more about the design and operations of Opto's products, and that he needed to improve his follow-through on projects. (*Id.* ¶¶ 30, 31; Chmiel Dep., at 156, 167.) Indeed, on Chmiel's Annual Exempt Performance Evaluation, Hegberg indicated that he had "concern[s] about [Chmiel's] product knowledge" and stated that Chmiel's "follow through is not acceptable." (DX 8, Annual Exempt Performance Evaluation of 4/2/02, at 2-3.) Hegberg gave Chmiel a 4 or 4.5% salary increase in connection with the 2002 review which, Hegberg says, reflected his belief that although Chmiel was doing some things well, he needed to be more involved in manufacturing and develop more knowledge of the company's products.[8] (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 103; Hegberg Dep., at 132; DX 8.)

In addition to annual merit-based raises, Chmiel (and all other Opto employees) had the opportunity to earn a discretionary bonus of up to 5% of his salary each year for exceeding performance goals. (Def. 56.1 ¶¶ 21, 22.) The parties do not indicate whether Chmiel received an incentive bonus in 2001, but he did not receive one in 2002. (*Id.* ¶ 23.)

## B.  Chmiel's Medical Conditions

As an Opto employee, Chmiel was a participant in the company's medical insurance plan (the "Plan"), an ERISA welfare plan. (Def. 56.1 ¶¶ 33, 34.) *See* 29 U.S.C. § 1002(1). During his

---

[8]     By comparison, Director of Engineering James Swayne received a 9% raise in June 2002. (Pl. 56.1 ¶ 188; Def. 56.1 Resp. ¶ 188.)

employment, Chmiel had certain medical conditions, including cataracts, diabetes, small blood vessel disease in the brain, and meningioma ("a benign, slow-growing tumor" of the membranes enveloping the brain and spinal chord). DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 28th ed., p. 1010. (*See also* Def. 56.1 ¶ 36; Pl. 56.1 ¶ 127.) Chmiel openly discussed the fact that he was having cataract surgery in the summer of 2002, but he never told anyone at Opto about the diabetes, small blood vessel disease, or meningioma. Hegberg says that he was not aware of the latter three conditions and never discussed them with anyone at Opto, including Senior Human Resource Generalist and Financial Specialist, Brenda Muehlfeld (age 25 as of September 12, 2002). (Def. 56.1 ¶¶ 37–40; Pl. 56.1 ¶¶ 128, 134, 154; PX X.) Muehlfeld similarly denies any knowledge of Chmiel's diabetes, small blood vessel disease, or meningioma. (Muehlfeld Dep., at 65.)

Chmiel infers that Hegberg did in fact know about all of his medical conditions because Hegberg knew that Unum Provident Insurance and Mass Mutual Insurance had both declined his applications for long-term disability insurance around the time he was hired. Specifically, Chmiel met with Brian Ullrich of Ullrich Brokerage Limited, the insurance and securities brokerage that assisted Opto with its employee benefit plans, and provided information to apply for long-term disability insurance. Ullrich filled out the application form based on his interview with Chmiel and forwarded it to Unum Provident, which declined to provide coverage. Ullrich unsuccessfully appealed the decision to Provident, and also looked for alternative coverage with other carriers, including Mass Mutual. Mass Mutual similarly declined to provide coverage for Chmiel, and Ullrich ultimately concluded that there was no market for providing him with disability insurance. Because Opto was the insurance applicant on behalf of Chmiel, Ullrich notified Hegberg that Chmiel had been declined for long-term disability coverage. (Pl. 56.1 ¶¶ 157-163, 166; Pl. 56.1 Resp. ¶¶ 38, 39; Ullrich Dep., at 5-6, 12-15, 18.) Ullrich testified, however, that he has no knowledge as to why Chmiel's application was denied and was never privy to any of the underlying medical information

(and therefore could not have conveyed such information to Hegberg). (Ullrich Dep., at 16-17.) Chmiel concedes that Ullrich instructed Unum Provident and Mass Mutual to provide all medical information directly to Chmiel's doctors due to its confidential nature. (Id.; Pl. 56.1 ¶ 164.)

## C. Chmiel's Discharge

Hegberg claims that after his February or March 2002 performance review, Chmiel failed to improve his product knowledge, to spend more time on the production floor, or to follow through on projects to Hegberg's satisfaction. (Def. 56.1 ¶¶ 59, 60; Hegberg Aff. ¶ 11.) Chmiel objects that Hegberg "could not have observed the total amount of time Plaintiff spent on the production floor," but Hegberg testified that in addition to his own observations, he received complaints about Chmiel's lack of involvement from Director of Operations Kiss, planner/scheduler Helen Kuzmyn, quality inspector Hahn Kantorski, and team leader/production supervisor Rita Ritchie.[9] Muehlfeld also told Hegberg that employees complained to her about the same issue. (Hegberg Dep., at 84-85, 89, 92-98; Pl. 56.1 Resp. ¶ 60; Def. 56.1 ¶ 61.) Kiss testified that he had received similar employee complaints regarding Chmiel's failure to spend time on the production floor, and that he personally found Chmiel's technical and product knowledge less than satisfactory. To that end, Kiss told Hegberg that Chmiel needed to be more hands-on and have a better understanding of Opto's products. (Def. 56.1 ¶¶ 62-64.) Chmiel counters, without any record citation, that Kiss thought his performance was strong. (Pl. 56.1 Resp. ¶¶ 62, 63.)

In early August 2002, Hegberg met with Chmiel and set specific performance goals relating to product knowledge and time on the production floor. (Def. 56.1 ¶ 65; Hegberg Dep., at 56-58, 177-78; Pl. 56.1 ¶ 121.) Chmiel has no recollection of the meeting and notes that Hegberg neither documented the performance goals nor provided a deadline for improvement. (Pl. 56.1 ¶¶ 121,

---

[9]     As of September 12, 2002, Kuzmyn was 58 years old and Ritchie was 43 years old. (PX X.) The record does not reflect the age or birth date of Hahn Kantorski.

6

124.) As noted, however, he admits that Hegberg told him to spend more time in the shop working with the quality inspectors. (Chmiel Dep., at 129.)

Also in or about August 2002, Hegberg decided that Opto did not need an employee solely to manage Opto's quality assurance activities, "especially one who did not know the products and who did not spend sufficient time working with the production employees, engineers and quality inspectors." Rather, Hegberg believed that Opto needed a quality control and assurance employee who was actively involved with quality inspectors and production employees. (Def. 56.1 ¶¶ 67, 68.) As a result, Hegberg decided to terminate Chmiel's employment on September 30, 2002. (Id. ¶¶ 69, 71, 72.) Hegberg paid Chmiel's salary through October 30, 2002 and his health insurance premiums through November 15, 2002. In addition, to assist Chmiel with his search for a new position, Hegberg gave him a reference letter drafted by Muehlfeld. (Id. ¶¶ 73, 74.) That letter stated that Chmiel "proved himself to be a talented report writer and an inquisitive employee. He was eager to learn about all aspects of the company. Overall, [Chmiel] was always a great help to me. I certainly believe he has what it takes to become an asset to any quality department." (PX H.)

At Chmiel's request, Ron Kiss also agreed to serve as a reference "[b]ecause I believe in certain positions, in certain companies, he would be a better benefit." (Kiss Dep., at 74.) Chmiel claims that when he called Kiss sometime in October 2002 to ask him to be a reference, Kiss stated he was "dumbfounded" as to why Hegberg let Chmiel go. Kiss testified, however, that he had personally told Hegberg that Chmiel needed to be more hands-on at the company and did not know the product well. (Chmiel Dep., at 183-84; Kiss Dep., at 45-49.)

**D.    Opto Investigates New Insurance Coverage**

In 2000 and 2001, Opto experienced large increases in health insurance premiums charged by its insurance carrier, Principal Mutual Insurance Company ("Principal"). (Def. 56.1 ¶ 44.) Opto

never received any explanation for the cause of these large increases, though Ullrich speculates that it could have been general inflation in health insurance premiums, "coupled with the possibility that Opto's original premium was a low rate to obtain the business." (Id. ¶¶ 45, 46.) In July 2002, Opto began investigating alternative health insurance plans, asking all employees to submit a Blue Cross/Blue Shield form (the "Blue Cross Form") to Muehlfeld. The Blue Cross Form asked employees to provide certain health-related information required by Blue Cross as evidence of insurability for prescreening purposes. Chmiel submitted a Blue Cross Form indicating that he suffered from diabetes and had recently undergone cataract surgery. (Id. ¶¶ 47-50; Pl. 56.1 ¶¶ 153, 169-71.) Muehlfeld claims that she never read any of the Blue Cross Forms and did not know about Chmiel's diabetes. Chmiel denies this, but merely points to the fact that Muehlfeld confirmed that she had received all of the employee forms. (Id. ¶ 52; Pl. 56.1 Resp. ¶ 52; Muehlfeld Dep., at 74.)

Muehlfeld gave the Blue Cross forms to Brian Ullrich along with the "census data needed to obtain quotes from insurance carriers"; i.e., a list of all company employee names, social security numbers, dates of birth, dates of employment, and the number of employee dependents. (Pl. 56.1 ¶¶ 149, 153, 155.) On September 27, 2002, however, Principal notified Opto that it would renew Opto's health insurance with only a modest (approximately 4%) increase in the premium. Opto therefore decided not to change carriers and even reduced the premiums paid by the employees. (Def. 56.1 ¶¶ 53, 54; Pl. 56.1 ¶ 151; Def. 56.1 Resp. ¶ 151.) Muehlfeld notified the employees of the decision by e-mail dated September 27, 2002. (Id. ¶ 58; PX U.)

A few days later, on October 4, 2002, Principal prepared a Comprehensive Medical Insurance Proposal Summary offering a $300 individual deductible based on census data that, for reasons not explained in the record, did not include Chmiel but did include his dependent daughter,

8

Jodi.[10] (PX Y; Pl. 56.1 ¶ 156.) Four days later, Principal sent Opto and Ullrich a renewal premium quote letter offering a $400 individual deductible based on a census that did include Chmiel. (DX 15.) Defendants claim that the October 4 proposal offering a $300 deductible "was received after Principal's initial written renewal proposal dated October 8, which included the same, higher ($400), deductible as in prior years. Thus, the initial renewal premium [i.e., the October 8 quote] was based on Plaintiff's inclusion in the company census." (Def. 56.1 Resp. ¶ 156; Ullrich Dep., at 41-42, 51.) Nothing in the record explains why Principal's initial renewal premium was dated four days after a supposedly subsequent quote offering a revised, lower deductible rate, though in their briefs, Defendants claim that the October 8 letter was the actual renewal offer whereas the October 4 letter was just an alternate proposal. (Defendants' Reply in Support of Their Motion for Summary Judgment ("Opto Reply"), at 6.)

Chmiel believes that his medical conditions were "a source of" Opto's "double-digit insurance cost increases during the two years [he] worked for [Opto]." He also believes that Hegberg had discussions with Principal to that effect. (Pl. 56.1 ¶ 177.) In support of these beliefs, Chmiel offers the following evidence: (1) he and his doctor's office submitted documentation to Principal when he underwent cataract surgery and whenever he had his periodic MRIs for his small blood vessel disease and brain tumor (meningioma); and (2) he exceeded his out-of-pocket insurance limit by August 2002. (Pl. 56.1 ¶¶ 172, 173, 175, 176.) The court notes that this evidence supports Chmiel's belief that his medical condition influenced Opto's premiums, but does not establish that Hegberg had any discussions concerning this matter.

## E.    The Quality Assurance Engineer Position

Hegberg initially believed that Ron Kiss could take over Chmiel's responsibilities in supervising the quality department. (Def. 56.1 ¶ 75.) A few weeks after Chmiel's discharge,

---

[10]    The record reflects that Jodi was covered by Opto's health insurance plan under Chmiel's policy, but there is no indication whether she suffered from any health problems.

however, Kiss advised Hegberg that he could not handle his own workload and also be responsible for the day-to-day quality issues that arose on the production floor, and that Opto needed a Quality Assurance Engineer. (Pl. 56.1 ¶¶ 137, 138, 140; Def. 56.1 Resp. ¶¶ 137, 138, 140; Kiss Dep., at 40, 53, 58; Hegberg Dep., at 63, 65-68.) The two men discussed filling that position with a hands-on technical person who would spend more time working on the production floor with the manufacturing and quality control employees. (Def. 56.1 ¶ 76.) Opto advertised the position on the internet and received approximately 300 applications or resumes. (Pl. 56.1 ¶¶ 129, 142, 207; PX M.)

Chmiel saw the job posting and submitted a resume and cover letter to Muehlfeld, who forwarded them on to Hegberg. (Pl. 56.1 ¶¶ 141, 142.) Opto contacted approximately 20 applicants for personal interviews but did not respond to Chmiel's application. Instead, Opto hired George Siepiora on October 25, 2002 at an annual salary of $65,000. The parties agree that Siepiora is "substantially younger" than Chmiel but have not provided his exact age or date of birth. (Id. ¶¶ 207, 208, 210; Def. 56.1 ¶¶ 78, 81; PX Q.) Siepiora learned about the Quality Assurance Engineer position from his neighbor, Opto team leader/production supervisor Rita Ritchie, and submitted an application on October 2, 2002. (Pl. 56.1 ¶ 143; Def. 56.1 Resp. ¶ 143; Siepiora Dep., at 5-6.) Opto claims that Siepiora has "more relevant technical expertise than Chmiel" and "spends more time on the production floor working with manufacturing and quality assurance employees." (Def. 56.1 ¶ 77.) He does not have any management responsibilities, nor does he supervise any Opto employees, but he is considered an exempt employee for purposes of federal and state wage and hour laws. (Id. ¶ 79; Pl. 56.1 ¶¶ 184, 191.)

Chmiel claims that with one or two exceptions, the duties of Quality Assurance Engineer as posted on the internet "mirrored" his own responsibilities as Quality Manager. (Pl. 56.1 ¶ 144; Chmiel Dep., at 273-74.) In fact, there appear to be several differences in the job descriptions. Unlike the Quality Manager, the Quality Assurance Engineer is not responsible for developing and

initiating standards and methods for inspection, testing, and evaluation; devising sampling procedures and designs; developing forms and instructions for recording, evaluating, and reporting quality data; establishing programs to evaluate precision and accuracy of production equipment and testing; creating and monitoring the department budget; directing workers engaged in measuring and testing product; or compiling and writing training materials. In addition, only the job description for Quality Assurance Engineer includes updating and maintaining the company quality manual and maintaining calibration of all test equipment. (PX K, L, M.)

**F.     Chmiel's Lawsuit**

On November 29, 2002, Chmiel filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he was discharged because of his age and a perceived disability in violation of the ADEA and ADA, respectively. (Ex. A to Pl. 56.1.) Approximately two weeks later on December 16, 2002, Chmiel filed this federal lawsuit alleging age and disability discrimination and claiming that Opto and Hegberg deliberately interfered with his receipt of ERISA medical benefits. Defendants have moved for summary judgment on all claims.

**DISCUSSION**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's

11

version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; she must offer evidence sufficient to support a verdict in her favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Employment discrimination cases are inherently fact-intensive, but the court is not required to "scour the record" in an effort to assist the plaintiff in avoiding summary judgment. *Greer v. Bd. of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001).

Chmiel claims that Opto discharged him on the basis of his age and a perceived disability (cataracts, diabetes, small blood vessel disease, and meningioma) in violation of the ADEA and ADA, respectively. He also claims that Opto and Hegberg deliberately interfered with his receipt of medical benefits in violation of ERISA. The court addresses each argument in turn.

## A. Age Discrimination

Chmiel may establish discrimination under the ADEA using either the direct or indirect method of proof. Under the direct method, Chmiel must either present direct evidence which, if believed by the finder of fact, "will prove the particular fact in question without reliance upon inference or presumption," or circumstantial evidence that establishes a "convincing mosaic" of discrimination. *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Chmiel does not claim to have any evidence of discrimination supporting the direct method of proof and must therefore proceed under the familiar *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that approach, he must first establish a prima facie case of discrimination by proving that (1) he is a member of the protected class (age 40 or older); (2) he was performing at a level that met Opto's legitimate expectations; (3) he was subject to an adverse employment action; and (4) he was treated differently than younger, similarly situated

employees.[11] *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 574 (7th Cir. 2003); *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 676 (7th Cir. 2002). If Chmiel succeeds in making out a prima facie case, the burden shifts to Opto to articulate a legitimate, non-discriminatory explanation for the adverse employment action. If such a reason is offered, Chmiel "bears the ultimate burden of showing that it is a pretext for discrimination." *Schuster*, 327 F.3d at 574 (quoting *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002)).

Opto claims that Chmiel cannot establish a prima facie case of age discrimination because he was not meeting Opto's legitimate expectations at the time of his discharge, and because he has not identified any similarly situated younger employees who took over his job or were treated more favorably than him. Opto also claims that it has articulated a legitimate, non-discriminatory explanation for Chmiel's discharge which Chmiel cannot demonstrate is a pretext for unlawful discrimination.

### a. Performance Expectations

Opto has presented substantial evidence indicating that Hegberg was not satisfied with Chmiel's performance. At Chmiel's February 2001 performance review, Hegberg urged him to become more familiar with Opto's product line and to spend more time out of his office working with the quality inspectors, engineers, and manufacturing employees. (Def. 56.1 ¶ 25; Hegberg Aff. ¶ 4; PX S, Annual Staff Performance Evaluation of 2/20/02, at 3.) Hegberg expressed similar concerns at Chmiel's February or March 2002 performance review, stating that Chmiel needed to "improve

---

[11] Chmiel attempts to characterize his claim as one for failure to hire, which requires him to show that (1) he is a member of the protected class (age 40 or older); (2) he applied for and was qualified for the position he sought; (3) Opto rejected him; and (4) Opto hired another similarly situated individual for the position who was substantially younger than Chmiel. *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003). (*See* Plaintiff's Memorandum of Law in Response to Defendant's Motion for Summary Judgment ("Pl. Resp."), at 4.) The court views Opto's explanations for Chmiel's termination, discussed below, as a defense to any failure to hire claims as well, and therefore does not address separately Chmiel's assertion that Opto's failure to hire him immediately after his discharge was an independent violation of his rights.

his technical understanding and ability with respect to Opto's products so that he could participate more in discussions with sales, marketing and engineering about designs." (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.) On Chmiel's Annual Exempt Performance Evaluation, Hegberg wrote that he had "concern[s] about [Chmiel's] product knowledge" and stated that Chmiel's "follow through is not acceptable." (DX 8, Annual Exempt Performance Evaluation of 4/2/02, at 2-3.) Hegberg gave Chmiel a 4 or 4.5% salary increase (compared with a 7.5% increase the previous year) which, he says, reflected his belief that although Chmiel was doing some things well, he needed to be more involved in manufacturing and develop more knowledge of the company's products. (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 103; Hegberg Dep., at 132; DX 8.)

Hegberg concluded that even after the 2002 performance review, Chmiel failed to improve his product knowledge, to spend more time on the production floor, or to follow through on projects to Hegberg's satisfaction. (Def. 56.1 ¶¶ 59, 60; Hegberg Aff. ¶ 11.) Hegberg formed this belief based on personal observation as well as complaints he received from Director of Operations Kiss, planner/scheduler Helen Kuzmyn, quality inspector Hahn Kantorski, and team leader/production supervisor Rita Ritchie regarding Chmiel's lack of involvement. Muehlfeld told Hegberg that employees complained to her about the same issue, and Kiss told Hegberg that Chmiel needed to be more hands-on and to have a better understanding of Opto's products. (Hegberg Dep., at 84-85, 89, 92-98; Pl. 56.1 Resp. ¶ 60; Def. 56.1 ¶¶ 61-64.)

Chmiel denies that his performance was poor and notes that Hegberg himself believes Chmiel did a good job preparing failure analysis reports and corrective action reports. (Pl. Resp., at 8.) The fact that Chmiel did some tasks well, however, does not establish that his overall performance met Opto's legitimate expectations with respect to spending more time working with quality inspectors and learning the product line. Nor is the court persuaded by Chmiel's assertion that he did in fact spend half of his time out on the production floor. Chmiel relies solely on the testimony of John DiNardi who was no longer working at Opto as of May 2000, some eight months

14

prior to Chmiel's first performance review. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545-46 (7th Cir. 2002) ("[t]he question is not whether at any time in Mr. Peters' employment he was meeting his employer's expectations; the question is whether he was meeting his employer's expectations at the time he was terminated").

That leaves Chmiel's testimony that Hegberg told him the termination was due to economic as opposed to performance reasons, and Hegberg's letter of recommendation indicating that Chmiel "has what it takes to become an asset to any quality department." (Chmiel Dep., at 179-80; PX H.) In light of the more specific criticisms of his performance, the court is reluctant to characterize Hegberg's statement, made as part of a generic recommendation, as sufficient to establish that Chmiel's performance met Opto's legitimate expectations. Because the case can ultimately be decided on the issue of pretext, however, the court nevertheless proceeds to address the remaining elements of the Indirect method of proof.

### b. Similarly Situated Younger Employees

Opto also argues that Chmiel has not identified any similarly situated younger employees who received more favorable treatment than he did. In fact, the record reflects that within a month of Chmiel's termination, Opto hired George Siepiora whom the parties agree is "substantially younger" than Chmiel. Opto denies that Siepiora is similarly situated to Chmiel, noting that Siepiora was hired as a Quality Engineer as opposed to a Quality Manager, and that he is an electronics engineer whereas Chmiel is an electrical engineer. (Opto Reply, at 8-9.) To the extent that Siepiora and Ron Kiss (age 31 as of September 12, 2002) took over Chmiel's former duties, however, Chmiel "has satisfied the fourth element of the prima facie test because he was treated less favorably than two substantially younger [employees] whose responsibilities were fungible with his own." *Miller v. Borden, Inc.*, 168 F.3d 308, 313 (7th Cir. 1999) (in "fungibility" case where employee's duties are absorbed by other employees, "an employer who discharges a protected

15

employee and either hires or retains younger employees to fill positions for which the older employee was qualified bears the burden of explaining its actions") (internal quotations omitted). *See also Schmidt v. R. Lavin and Sons, Inc.*, No. 00 C 0804, 2001 WL 290362, at *4 (N.D. Ill. Mar. 22, 2001) ("[a] plaintiff, in a single-discharge case, does not need to make a showing that similarly situated employees were treated better because an inference of discrimination arises from the fact that the plaintiff was constructively 'replaced' by workers outside of the protected class").[12]

### c. Pretext

As noted, Opto has articulated legitimate, non-discriminatory explanations for Chmiel's discharge; namely, his poor performance and the company's decision to eliminate his Quality Manager position. (Opto Mem., at 8.)[13] Chmiel argues that these explanations are pretextual and cannot support summary judgment. He first challenges Hegberg's claim that he eliminated the Quality Manager position altogether and gave the duties to Ron Kiss. Kiss testified that a few weeks after Chmiel's discharge, he advised Hegberg that he could not handle his own workload and also be responsible for the day-to-day quality issues that arose on the production floor, and asked Hegberg to hire a Quality Engineer. (Pl. 56.1 ¶¶ 137, 138, 140; Def. 56.1 Resp. ¶¶ 137, 138, 140; Kiss Dep., at 40, 53, 58; Hegberg Dep., at 63, 65-68.) Just two days after Chmiel's termination, however, Siepiora submitted an application for the specific Quality Engineer position,

---

[12]    In a footnote, Chmiel claims that he was subjected to "less favorable terms and conditions of his employment" than similarly situated younger managers with respect to salary. (Pl. Resp., at 5 n.1.) Chmiel made no such allegation in his EEOC charge and has failed to develop the argument before this court, such as demonstrating that the younger managers were in fact similarly situated to him in all relevant respects. *See Peters*, 307 F.3d at 550 ("[g]enerally, a plaintiff may not bring claims under [the ADEA] that were not originally brought among the charges to the EEOC"); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) (requiring employee to show that comparative employees were "similarly situated with respect to performance, qualifications and conduct"). Thus, Chmiel cannot establish an ADEA claim on this theory.

[13]    The Memorandum in Support of Defendants' Motion for Summary Judgment is cited as "Opto Mem., at __."

having learned about it from his neighbor, Rita Ritchie. (Pl. 56.1 ¶ 143; Def. 56.1 Resp. ¶ 143; Pl. Resp., at 5.) This does suggest that Hegberg always intended to hire someone to replace Chmiel; it does not, however, demonstrate that Hegberg fired Chmiel because he wanted a younger worker. *See Schuster*, 327 F.3d at 573 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)) ("the employee's protected trait must have 'actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome'").

To the contrary, as noted, Opto has presented substantial evidence that Chmiel was not performing well at the time of his discharge and ignored repeated requests that he learn the company's products better and spend more time working with the quality inspectors on the production floor. The court has already rejected Chmiel's assertion that he spent half his time working on the production floor (Pl. Resp., at 9 n.3); DiNardi's testimony to that effect is unpersuasive because he was no longer employed at Opto as of May 2000 and only observed Chmiel for approximately three months. Chmiel makes much of the fact that he did a good job preparing reports and even "designed, developed, and implemented a test fixture for one of Defendant's clients on his own initiative." (*Id.* at 7.) As the Seventh Circuit has observed, however, the fact that Chmiel did "some things well does not mean that any reason given for his firing is a pretext for discrimination." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 846 (7th Cir. 1996) (quoting *Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 403 (7th Cir. 1992)). This is particularly true where, as here, Chmiel has not pointed to any facts suggesting that his age played any role whatsoever in his discharge, much less that it was "a motivating factor." *See Johnson v. Zema Systems Corp.*, 170 F.3d 734, 746 (7th Cir. 1999) ("[t]he difficulty with Johnson's ADEA claim is the absence of any evidence that age was a motivating factor in Zema's decision to discharge").

Chmiel also claims that the Quality Engineer position and the Quality Manager positions are essentially the same. In his view, the fact that he "performed the dual role of Quality Manager and

17

Quality Engineer" demonstrates that Opto's claim to have eliminated the Quality Manager position is a pretext. (Pl. Resp., at 6-7.) The record indicates, however, that Ron Kiss assumed the management responsibilities and that Siepiora really was just a Quality Engineer. Chmiel urges that Opto's decision to divide responsibilities in this manner demonstrates that Opto treated him unfairly in expecting him to perform all of the duties himself. (Id. at 9 n.3.) To the extent Opto hired Chmiel as a Quality Manager and clearly set forth his responsibilities for that position, this argument has no merit. (See PX K, Job Description, Quality Assurance Manager.) In any event, there is no evidence that Chmiel believed the job was unmanageable, nor does Chmiel now suggest that it was too much for him.

Chmiel next contends that he was qualified for the Quality Engineer position and should have been hired for that job. He notes that Siepiora now prepares failure analysis reports and corrective action reports, which are tasks he performed well. (Pl. Resp., at 8.) Regardless, it is undisputed that Hegberg believed Chmiel performed other tasks poorly and particularly sought out someone who would spend more time on the production floor and learn Opto's products better than Chmiel did. (Hegberg Dep., at 170; Def. 56.1 ¶¶ 67, 68.) Chmiel's belief that he "possessed the requisite electrical engineering background to serve as Defendant's Quality Engineer" in no way establishes that Hegberg did not honestly believe that his performance suffered from the other cited deficiencies. See Wilson v. AM General Corp., 167 F.3d 1114, 1120-21 (7th Cir. 1999) ("the issue is not the adequacy in fact of plaintiff's performance; rather, it is the honesty of the company's belief that plaintiff's performance was inadequate that controls").

Finally, even if Opto's decision to hire Siepiora was ill-conceived because he was somehow lacking in experience and expertise, that would not demonstrate that Opto fired Chmiel because it wanted to bring on a younger worker. See Franzoni v. Hartmarx Corp., 300 F.3d 767, 772 (7th Cir. 2002) ("pretext requires more than a showing that the business decision was 'mistaken, ill considered or foolish,' and . . . so long as the employer 'honestly believed' the reason given for the

18

action, pretext has not been shown"); *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir.

1999) (quoting *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 300 (7th Cir. 1998)) (the court "does

not sit as a super-personnel department that reexamines an entity's business decisions"). Indeed,

"when an employee is hired and fired by the same decision-maker in a relatively short time span,

a presumption, or inference, of nondiscrimination arises." *Chiaramonte v. Fashion Bed Group, Inc.*,

129 F.3d 391, 399 (7th Cir. 1997) (decision-maker hired plaintiff when he was 52 years old and

fired him two years later). Here, Hegberg hired Chmiel on February 21, 2000 at the age of 57 and

fired him two and a half years later on September 30, 2002. Chmiel has not presented any

evidence suggesting that his age was a motivating factor in Hegberg's decision to discharge him,

and Opto is entitled to summary judgment on Chmiel's ADEA claim.

## B.    Disability Discrimination

To establish a claim under the ADA, Chmiel must first prove that he is disabled within the

meaning of the Act and that he is qualified to perform the essential functions of the job either with

or without reasonable accommodation. *Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 631 (7th Cir.

2003); *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000). Disability is defined

as "(A) a physical or mental impairment that substantially limits one or more of the major life

activities of such individual; (B) a record of such an impairment; or (C) being regarded as having

such an impairment." 42 U.S.C. § 12102(2); *Dyke*, 327 F.3d at 632. If Chmiel makes this

threshold showing, he must then establish a violation of the Act either by presenting evidence of

disparate treatment or by showing a failure to accommodate. *Sieberns v. Wal-Mart Stores, Inc.*,

125 F.3d 1019, 1021-22 (7th Cir. 1997).

Opto argues that Chmiel cannot succeed on his claim of disability discrimination because

he does not have a disability within the meaning of the Act. The court agrees. Chmiel suffers from

diabetes, small blood vessel disease, and meningioma, and had cataract surgery in the summer

19

of 2002. He concedes that none of these impairments constitutes a disability but argues that Opto regarded him as disabled. The "regarded as" provisions of the ADA are designed to "provide a remedy for discrimination based on misperceptions about the abilities of impaired persons." *Krocka v. City of Chicago*, 203 F.3d 507, 513-14 (7th Cir. 2000). To establish a disability under § 12102(2)(C), Chmiel must show that Opto mistakenly believed that his nonlimiting impairment substantially limits one or more major life activities. *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521-22 (1999). "It is not enough for [Chmiel] to show that [Opto] was aware of [his] impairment; instead [Chmiel] must show that [Opto] knew of the impairment and believed that [he] was substantially limited because of it." *Moore*, 221 F.3d at 954 (quoting *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir. 1998)).

Chmiel claims that Opto regarded him as disabled because it "treated Plaintiff as though he was failing to meet reasonable performance expectations because it regarded Plaintiff as having such a serious pre-existing disability that he was ineligible for long-term disability coverage when in fact Plaintiff was satisfying the reasonable performance expectations of Defendants notwithstanding his cataracts, small blood vessel disease, and brain tumor [meningioma]." (Pl. Resp., at 14.) This argument misses the mark for several reasons. First, though it was common knowledge that Chmiel had cataracts and cataract surgery in the summer of 2002, there is no evidence that Hegberg or anyone else at Opto regarded the condition as substantially limiting. Chmiel finds it significant that when he referenced his scheduled surgery during a staff meeting, Opto's Director of New Business, Mark Gaston, joked, "Oh, the quality manager can't see." (Pl. 56.1 ¶ 205; Pl. Resp., at 15.) Even assuming such a statement could serve as evidence that Gaston perceived Chmiel to be disabled, it in no way demonstrates that Hegberg, the sole decisionmaker in this case, also perceived Chmiel to be suffering from a disability. *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002) ("statements by nondecisionmakers cannot satisfy a plaintiff's burden of proving discrimination"); *Rao v. County of Cook*, No. 00 C

20

5838, 2003 WL 22764588, at *11 (N.D. Ill. Nov. 19, 2003) ("an isolated remark, which is neither uttered by a decisionmaker nor contemporaneous with an adverse job action, is insufficient evidence of discrimination").

As for Chmiel's diabetes, small blood vessel disease, and meningioma, there is no evidence suggesting that Hegberg or anyone else at Opto knew about those conditions, much less believed them to be substantially limiting. Chmiel infers Hegberg's knowledge from the fact that Brian Ullrich told Hegberg that Chmiel was denied long-term disability coverage at the time he was hired. Ullrich testified, however, that he has no knowledge as to why Chmiel's application was denied and was never privy to any of the underlying medical information. (Ullrich Dep., at 16-17.) Chmiel concedes that Ullrich instructed the insurance companies to provide all such medical information directly to Chmiel's doctors due to its confidential nature. (*Id.*; Pl. 56.1 ¶ 164.) Even if Hegberg did know about Chmiel's conditions, moreover, Chmiel's mere speculation that he also regarded those conditions as disabling falls far short of establishing a perceived disability under the ADA. *See Nawrot v. CPC Int'l*, 277 F.3d 896, 903 n.1 (7th Cir. 2002) (employee's speculation that employer "fear[ed] that he was psychotic when he suffered [sic] hypoglycemia" did not support claim under the regarded as prong of the ADA); *Van Koten v. Family Health Mgmt., Inc.*, 134 F.3d 375 (7th Cir. 1998) ("subjective beliefs and speculation of a plaintiff are insufficient to create a genuine issue of material fact"). Indeed, Chmiel has not presented any evidence that Hegberg or anyone else at Opto believed him to be substantially limited in a wide range of jobs.

In *Moore v. J.B. Hunt Transport, Inc.*, the plaintiff claimed that he was fired from his position as a truck driving instructor because he suffered from rheumatoid arthritis. 221 F.3d at 948-49. In affirming summary judgment for the employer, the Seventh Circuit noted that the regarded-as section of the ADA requires "proof beyond the plaintiff's inability to satisfy the expectations of a single employer; to be 'substantial,' a limitation on the ability to work must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under

the ADA." *Id.* at 954. The court found no evidence that the employer regarded the plaintiff as restricted from performing a broad range of jobs and, thus, he was not regarded as disabled under the Act. *Id.* at 954-55.

In this case, similarly, Opto's belief that Chmiel was not meeting reasonable performance expectations by failing to spend sufficient time working with quality inspectors and learning the company's products in no way demonstrates that Opto perceived him as unable to perform a wide range of jobs. Significantly, Hegberg gave Chmiel a reference letter stating that Chmiel "proved himself to be a talented report writer and an inquisitive employee. He was eager to learn about all aspects of the company. Overall, [Chmiel] was always a great help to me. I certainly believe he has what it takes to become an asset to any quality department." (PX H.) *See Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002) ("[i]t is clear . . . that an employer does not regard a person as disabled simply by finding that the person cannot perform a particular job"); *E.E.O.C. v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1019 (7th Cir. 2001) (employer must perceive employee to be restricted in a broad range of jobs).

Chmiel insists that his termination is itself evidence of a perceived disability because, in his view, he was meeting Opto's legitimate performance expectations. (Pl. Resp., at 15.) It is well-established, however, that "the ADA only provides protection from adverse employment actions for individuals with disabilities." *Krocka*, 203 F.3d at 514. Evidence that Opto took an adverse action against Chmiel, who happens to suffer from an impairment, "is not evidence that [Opto] regarded that impairment as substantially limiting, and, thus, it is insufficient to show that [Opto] regarded [Chmiel] as disabled." *Id.* (citing *Harrington v. Rice Lake Weighing Sys., Inc.*, 122 F.3d 456, 461 (7th Cir. 1997)) ("[t]he notion that Rice Lake must have fired Harrington because it regarded him as disabled and that it plainly regarded him as disabled because it fired him is attractive but circular – it lacks a causal antecedent").

22

Chmiel's assertion that Opto perceived him as disabled because he "avail[ed] himself of the full measure of his medical insurance benefit[s]" is also unavailing. (Pl. Resp., at 15.) The plaintiff in *Moore* advanced a similar argument, asking the Seventh Circuit to "equate an interest in avoiding insurance costs with a perception of disability." 221 F.3d at 955 n.7. The plaintiff failed to cite any authority for the proposition or properly develop the argument, and the court considered it waived. *Id.* Chmiel does direct the court to two cases but neither supports his theory that an employer perceives an employee as disabled if it tries to avoid insurance costs. *See Jackson v. Lake County*, No. 01 C 6528, 2003 WL 22127743 (N.D. Ill. Sept. 15, 2003) (employer perceived "hypersensitive" employee as suffering from a mental impairment that substantially limited his major life activity of learning); *Kolovos v. Sheahan*, No. 97 C 4542, 1999 WL 1101919 (N.D. Ill. Nov. 30, 1999) (addressing perceived disability based on an employee's excessive absenteeism). Chmiel has failed to establish that Opto regarded him as disabled and, thus, he cannot state a claim of disability discrimination under the ADA.

## C.   ERISA Claim

Section 510 of ERISA makes it unlawful to "discharge . . . a [plan] participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. *See also Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 430 (7th Cir. 2000). To recover under this section, Chmiel must show that Opto discharged him "with the specific intent to interfere with his ERISA rights." *Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131, 135 (7th Cir. 1997). As with his ADEA claim, Chmiel lacks direct evidence of interference and instead proceeds under the burden-shifting approach. Accordingly, Chmiel must first establish a prima facie case of interference by demonstrating that (1) he belongs to the protected class (i.e., he is a plan "participant" or "beneficiary"); (2) he was qualified for his job position; and (3) he was discharged under circumstances that "provide some basis for believing

that the prohibited intent to retaliate was present." *Id.* The burden then shifts to Opto to articulate a legitimate, non-discriminatory reason for the discharge. If Opto satisfies this burden, then Chmiel must demonstrate that the proffered reason is a pretext and that the "'motivating factor behind the termination' was the specific intent to interfere with the plaintiff's ERISA rights." *Id.* (citing *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991)).

Chmiel claims that Hegberg fired him because "he was too great of an insurance risk and therefore too great of an insurance cost." (Pl. Resp., at 11.) In support of this argument, Chmiel focuses on two pieces of evidence: (1) Hegberg knew that he had cataract surgery in the summer of 2002; and (2) Hegberg knew that he was not able to secure long-term disability coverage. (Pl. Resp., at 11.) According to Chmiel, "a reasonable jury could conclude [from this information] that Hegberg was aware that Plaintiff's medical condition was sufficiently risky and costly from an insurance standpoint" and fired him "for the purpose of reducing his insurance costs." (*Id.*) Nothing in the record supports this inference. To the contrary, there is ample evidence that Hegberg was dissatisfied with Chmiel's performance and wanted an employee who would spend more time on the production floor and learn more about Opto's products. Hegberg's mere knowledge of Chmiel's cataract surgery and problems obtaining long-term disability coverage, standing alone, does *not* demonstrate that he fired Chmiel in order to reduce the company's insurance costs. *See Salus*, 104 F.3d at 136 (quoting *Meredith*, 935 F.2d at 127) (plaintiff must show that loss of benefits "was not a 'mere consequence' of his dismissal, but was in fact 'a motivating factor behind his termination'"); *Kemerly v. Bi-County Servs., Inc.*, No. 1:00-CV-254, 2003 WL 22595802, at *12 (N.D. Ind. Oct. 7, 2003) (granting summary judgment where employee "failed to show, beyond mere speculation, that [the employer] was motivated to terminate him because of an anticipated health insurance claim").

Chmiel claims that just eight days after his discharge, Opto renewed its insurance policy with Principal "at a considerably more favorable rate than that which they paid during the two years

of Plaintiff's employment with Opto." (Pl. Resp., at 12.) This is not exactly true. Opto began investigating alternative health insurance plans in July 2002. On September 27, 2002, three days before Chmiel's September 30 discharge, Opto's existing carrier (Principal) notified the company that it would renew Opto's health insurance with only a modest increase in the premium. (Def. 56.1 ¶¶ 53, 54; Pl. 56.1 ¶ 151; Def. 56.1 Resp. ¶ 151.) The same day, Muehlfeld notified the employees that Opto would continue with Principal. (*Id.* ¶ 58; PX U.)

Chmiel contends that the insurance rate increase was modest because it was based on census data that did not include him and reflected the fact that his insurance coverage would end after his COBRA benefits expired. (Pl. Resp., at 12-13.) There is some confusion on the first point. On October 4, 2002, Principal prepared a Comprehensive Medical Insurance Proposal Summary offering a $300 individual deductible and a 9.7% increase in premiums based on a census that, for reasons unexplained in the record, did not include Chmiel but did include his dependent daughter, Jodi. (PX Y; Pl. 56.1 ¶ 156.) Four days later, Principal sent Opto and Ullrich a renewal premium quote letter offering a higher $400 individual deductible but a lower (5.4%) premium increase based on a census that did include Chmiel. (DX 15.) Defendants claim that they received the October 4, 2002 proposal after the October 8, 2002 proposal and that "the October 8 Notice was the actual renewal [whereas] the October 4 Notice was an alternative quote based on a lower deductible." (Opto Reply, at 6; Def. 56.1 Resp. ¶ 156; Ullrich Dep., at 41-42, 51.) Neither party has explained why Principal sent two proposals within four days of each other based on different census information. It is undisputed, however, that Opto renewed its coverage with Principal based on an approximately 4% premium increase; that the October 8 letter offers a 5.4% increase compared with a 9.7% increase in the October 4 letter; and that Chmiel was included in the census data used for the lower October 8 premium quote.[14]

---

[14]    Hegberg paid Chmiel's health insurance premiums through November 15, 2002
(continued...)

25

As for Chmiel's speculation that Principal must have considered his impending discharge in formulating the premium quote, this is insufficient to indicate the intent required for an ERISA § 510 claim. There is no evidence that Hegberg spoke with anyone at Principal prior to renewing Opto's policy on September 27, 2002, much less that they discussed Chmiel, his specific health conditions, or his impending discharge. *See Singley v. Illinois & Midland R.R. Inc.*, 127 F. Supp. 2d 1037, 1047 (C.D. Ill. 2001) (plaintiff failed to show any adverse action taken with specific intent to interfere with his ERISA rights "[d]espite speculating extensively"). *See also Chiaramonte*, 129 F.3d at 401 ("if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed"). Chmiel has not demonstrated that the motivating factor for his discharge was the denial of, or interference with, his ERISA rights and Defendants' motion for summary judgment on this claim is therefore granted. *See Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 577 (7th Cir. 1998) ("[b]ecause Fairchild cannot establish that the desire to reduce or interfere with his ERISA rights was the motivating factor in his termination, or that the reason Forma gave for his termination was pretextual, his ERISA claim must fail").

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (Docket No. 10-1) is granted.

ENTER:

Dated: July 19, 2004

REBECCA R. PALLMEYER
United States District Judge

---

[14](...continued)
before converting him to COBRA coverage. (Def. 56.1 ¶ 74.)